# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ROANOKE DIVISION

| | | |
|---|---|---|
| CARL D. GORDON, | ) | Case No. 7:15-cv-00095 |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| DIRECTOR FRED SCHILLING, *et al.*, | ) | By: Norman K. Moon |
|     Defendants. | ) | United States District Judge |

Carl D. Gordon, a Virginia inmate proceeding *pro se*, filed a complaint pursuant to 42 U.S.C. § 1983 naming two defendants: Fred Schilling, the Health Services Director for the Virginia Department of Corrections ("VDOC"), and Dr. Mark Amonette, the Chief Physician for the VDOC. Gordon argues that the defendants (1) drafted and implemented policies that violated the Fourteenth Amendment by depriving him of due process and equal protection; and (2) took actions constituting deliberate indifference to his medical needs regarding Hepatitis C ("HCV") in violation of the Eighth Amendment. Gordon seeks damages, declaratory relief, and equitable relief, and the parties filed motions for summary judgment supported by affidavits. I conclude that defendants are entitled to summary judgment for all claims except the claim that appears to have accrued in 2011, for which I will order additional briefing.

## I.
### A.

Both Schilling and Dr. Amonette ensure prison staff's compliance with VDOC operating procedures about medical treatment. Schilling is not a medical doctor and, thus, does not make decisions about an inmate's diagnosis or treatment, and he does not intervene in medical decisions. Although a medical doctor, Dr. Amonette similarly does not make decisions about an inmate's diagnosis or treatment and does not intervene in medical decisions. Both Schilling and

Dr. Amonette rely on the professional judgment of doctors and nurses at each VDOC facility about inmates' medical care.[1]  Dr. Amonette has been the VDOC's Medical Director and Chief VDOC Physician since March 2013.

Gordon has been incarcerated within the VDOC since 1980 and expects to be paroled from the VDOC on October 10, 2028.  Gordon notes, however, that he is eligible for discretionary parole release every year.  During the times pertinent to this action, Gordon had been housed in Red Onion State Prison ("ROSP") until he was transferred to Wallens Ridge State Prison ("WRSP") on May 4, 2012.

It is not disputed that Gordon learned he was HCV positive in March 2008 while at ROSP.  While the parties have not discussed all of the treatment options available, Gordon proffers that:

> The most essential evaluation to be made after a HCV diagnosis is to determine whether there has been a histological change in the liver such as a fibrosis or cirrhosis, and the most accurate way to diagnose fibrosis or cirrhosis is through a liver biopsy.  Which I have never had done because I am excluded from treatment due to my annual parole eligibility date.

(Compl. ¶ 46.)  Under the former HCV treatment guidelines effective between 2004 and 2014, inmates were ineligible for treatment if, after a liver biopsy, they were parole eligible or had less than twenty-four months remaining before the inmate's earliest release date.  Inmates who were ineligible for biopsies would be referred to "Conservative Treatment."[2]  Gordon finds the VDOC position unreasonable because inmates convicted before the mid-1990s who are released through

---

[1] The VDOC contracts with licensed physicians to provide medical treatment to its inmates.

[2] The parties do not describe what constitutes "Conservative Treatment."

2

Case 7:15-cv-00095-NKM-RSB   Document 30   Filed 09/13/16   Page 2 of 12   Pageid#: 254

mandatory parole may not receive treatment in the VDOC whereas inmates serving life sentences with no possibility of parole do receive treatment from the VDOC.

Gordon explains that fibrosis can be reversed with interferon therapy, which the VDOC uses to eradicate HCV, and that the therapy can be concluded within any one-year period between his discretionary parole reviews. Gordon believes that the VDOC's apparent refusal to biopsy his liver is based only upon VDOC's desire to save money, which "may be causing" him to develop cirrhosis. An "HCV Fibrosure" blood analysis done in August 2015 revealed a "high" fibrosis score of 0.65 and Fibrosis stage of "F3-Bridging fibrosis with many septa." (ECF No. 15-2 at 20.)

Pursuant to the VDOC's HCV treatment policy in effect between 2004 and 2014, the doctor at ROSP added Gordon to the HCV chronic care list in March 2008. By being added to the list, Gordon expected to receive free, semi-annual liver function blood tests and exams.

A physician met with Gordon for chronic care visits on December 11, 2008; June 4, 2009; June 8 and December 23, 2010; and September 20, 2011. In addition to those chronic care visits, physicians reviewed Gordon's file and ordered lab work on June 2, 2011; September 21, 2012; September 16, 2013; and September 17, 2014.[3] Gordon is dissatisfied with these consultations and treatments because "no doctor has said anything to [him] about even the possibility of starting HCV treatment[] and kept telling [him] the [liver function tests] and doctor visits were to 'monitor' [him]."

---

[3] Medical staff determined that the lab results from September 2013 and September 2014 were within normal limits.

In 2011, VDOC policy changed to allow one annual liver function blood test and chronic care doctor visit instead of two semi-annually. Gordon filed a grievance about these reductions, and after it was denied, he appealed to Schilling. Gordon complained to Schilling that annual routine exams and tests were less than what was recommended by the Centers for Disease Control and Dr. Sanjiv Chopra, a hepatologist, and would not timely alert medical staff to a worsening viral load in his blood. Schilling upheld the grievance's denial on June 17, 2011, stating:

> Based on the information provided and upon further investigation, I concur with the Level I response and have determined your grievance UNFOUNDED. Be advised that the ROSP providers have the autonomy to monitor your chronic medical condition as your clinical needs change. It is important that you follow the recommendations of the medical staff regarding your treatment plan. Furthermore, the ROSP medical staff is comprised of licensed health care professionals who are qualified to provide medical services to you.
>
> If you continue to experience health issues, please resubmit a sick call request for further evaluation of your medial needs and treatment plan.

Gordon argues that Schilling's response was "solely to purposefully and maliciously mislead [him] into believing [he] would receive treatment for [his] HCV infection . . . . when in fact Mr. Schilling knew there was no plan to treat [his] HCV infection because [he] [is] eligible for parole once a year, though [his] mandatory release date is not until October 10, 2028." (Compl. ¶ 12.) Gordon explained to Schilling in April 2013 that:

> Medical refuses to have the doctor see me for the chronic care checkup I have not received since 2011, so that I cannot receive the blood pressure reading I'm entitled to receive free of charge during my chronic care doctor visit. Medical knows I should have received a chronic care checkup by the doctor last year but is deliberately indifferent to my serious medical condition.

4

(Compl. ¶ 13.) Schilling responded on June 18, 2013, noting:

> I concur with the Level I response and have determined your grievance UNFOUNDED. It is reported by Nurse Stanford that you are chronic care for the management of your Hepatitis infection. However, you are subject to a co-pay charge when you request medical services unless you have a follow up appointment scheduled by the healthcare staff. This issue is governed by OP 720.4.

(Compl. ¶ 14.)

In order to further investigate the issue, Gordon sought a copy of the VDOC's "written protocols/guidelines for when HCV treatment should begin." The WRSP Warden refused the request, and Schilling affirmed on July 29, 2013, explaining:

> Based on the information provided and upon further investigation, I concur with the Level I response and have determined your grievance UNFOUNDED. Dr. Miller is the WRSP medical authority responsible for your care and he will determine the course of your hepatitis treatment based on your past history and current medical status. The VA DOC hepatitis guidelines are restricted operating procedures; therefore, offenders are not allowed access to these procedures. This issue is governed by restricted policy.
>
> If you have any further issues, please resubmit a sick call request for further evaluation of your medical needs and treatment plan. You are encouraged to follow the recommendations of the health care staff as well. There is no violation of policy/procedure regarding this issue. No further action is needed from this level.

Gordon complains that no valid security rationale exists to prevent inmates from reading the HCV treatment guidelines and that Schilling's response was a "ruse" to "mislead [him] into believing that [he] will receive curative treatment for my HCV disease." (Compl. ¶ 29.)

Gordon further complains that a white inmate received a free chronic care checkup for HCV in 2013 while Gordon, a black inmate, did not. Gordon argued that the institutional physicians' treatment of a white inmate, but not a black inmate, with a free annual appointment

5

violated the Equal Protection Clause of the Fourteenth Amendment. Gordon presented these issues to Schilling via a grievance appeal in December 2013, and Schilling denied the appeal on January 14, 2014, noting:

> [Y]ou[] complain[] that the doctor is denying you the free chronic care visit.
>
> Based on the information provided and upon further investigation, I concur with the Level I response and have determined your grievance UNFOUNDED. As you have been advised, there is no evidence that Medical violated a policy. You do not have a chronic care diagnosis that VADOC recognizes at this time for chronic care. Hep C is not a chronic care clinic at this time. This issue is governed by OP 720.1, Access to Health Care Services.
>
> If you have any further issues, please resubmit a sick call request for further evaluation of your medical needs and treatment plan. No further action is needed from this level.

Gordon faults Schilling for not instructing WRSP medical staff to provide him the free chronic care doctor visit and checkups to which he felt entitled per VDOC policy.

Gordon filed a grievance about being denied chronic care treatment due to his parole eligibility, which was denied, and Schilling upheld the denial on February 13, 2015, noting:

> As you have been advised, the HCV guidelines are pending. Meanwhile, the WRSP medical department will continue to evaluate, monitor, and provide you with the medical care as your hepatitis condition dictates. This issue is governed by restricted policy.
>
> If you have any further issues, please resubmit a sick call request for further evaluation of your HCV condition and treatment plan. You are encouraged to follow the recommendations of the health care staff as well. There is no violation of policy/procedure regarding this issue.

Dr. Amonette explains why the VDOC did not offer routine treatment for HCV for inmates eligible for release:

> [I]]t was not ideal to have offenders leaving prison in the middle of treatment. Interrupting treatment could potentially do more harm if the offender is not able to complete treatment upon release from the VDOC. With the old medications used from around 2000 to 2014, there was also a significant rate of developing resistance to the medication if the treatment was cut short and not completed.

Dr. Amonette further explains, "It is not clear at this point whether resistance develops to the new medications that the VDOC is using" under the revised treatment guidelines, and thus, the temporal restriction is not included in the new treatment guidelines enacted in 2015. Gordon disagrees with Dr. Amonette's statement that the drugs used to treat HCV now are different than the drugs used between 2000 and 2014. (ECF no. 20 at 3.)

Dr. Amonette had suspended the VDOC's HCV treatment guidelines for one year between February 2014 and February 2015. The suspension was prompted because, in January 2014, the major national organization that develops HCV treatment guidelines no longer recommended the treatments the VDOC had been using since 2000. Consequently, Dr. Amonette did not feel that the VDOC could justify using drugs that were no longer recommended, but the VDOC was not yet prepared to start using new drugs. Consequently, Dr. Amonette suspended and revised the treatment guidelines while also arranging for the VCU Medical Center's hepatology group to render care to VDOC inmates with HCV. The VDOC enacted its updated HCV treatment guidelines in February 2015, which was the same month Gordon commenced this action.[4]

---

[4] Gordon's blood was tested in April 2015 to determine his eligibility for treatment under the new guidelines. The results revealed a Aspartate Aminotransferase to Platelet Ratio ("APRI") score of 0.664, which was below the threshold for treatment.
   Notably, the complaint does not concern the application of the 2015 treatment guidelines to Gordon's condition. Gordon did not file a supplemental pleading, and neither a motion for summary judgment nor a response thereto amends the complaint. *See, e.g., Cloaninger v. McDevitt*, 555 F.3d 324, 336 (4th Cir. 2009).

## II.

Gordon argues that Schilling's responses to his grievances, Dr. Amonette's suspension of the prior treatment guidelines, and the prior version of the treatment guidelines violate the Due Process and Equal Protection Clauses of the Fourteenth Amendment and constitute deliberate indifference in violation of the Eighth Amendment. For the following reasons, I will deny defendants' motion for summary judgment regarding the change of policy in 2011 that reduced the number of annual chronic care appointments, because additional briefing is needed. However, I will grant defendants' motion in all other respects and will deny Gordon's motion for summary judgment.

### A.

First, Gordon's substantive due process claims fail because "it is now well established that the Eighth Amendment serves as the primary source of substantive protection to convicted prisoners, and the Due Process Clause affords a prisoner no greater substantive protection than does the Cruel and Unusual Punishments Clause." *Williams v. Benjamin*, 77 F.3d 756, 768 (4th Cir. 1996) (citing *Whitley v. Albers*, 475 U.S. 312, 327 (1986)) (internal quotation marks omitted). Accordingly, a substantive due process claim adds nothing to Gordon's Eighth Amendment claim. *Id.*

Second, Gordon's procedural due process claims fail. Gordon does not identify the specific liberty or property interest that would trigger federal due process protections, and he does not establish what sort of procedural protections were required to protect that interest. *See, e.g., Sandin v. Conner*, 515 U.S. 472, 486-87 (1995). Furthermore, inmates do not have a

8

constitutional right of access to grievances or a right to a favorable determination of a grievance. *See, e.g.*, *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994).

Third, Gordon's equal protection claim fails. The fact that an institutional physician allegedly treated one white inmate differently than Gordon based on racial animus is not imputable to the defendants under *respondeat superior* as Gordon alleges generally. *See, e.g.*, *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 663 n.7 (1978); *Hill v. Lockheed Martin Logistics Mgmt.*, 354 F.3d 277, 291 (4th Cir. 2004); *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994). Accordingly, defendants are entitled to summary judgment regarding Gordon's due process and equal protection claims.[5]

### B.

Gordon claims that Schilling's responses to Gordon's grievance appeals responses constitute deliberate indifference to Gordon's HCV in violation of the Eighth Amendment. Gordon also claims that Dr. Amonette's decision to suspend the HCV treatment guidelines between February 2014 and February 2015 constitutes deliberate indifference to his HCV. Gordon further faults defendants for the change to the HCV treatment guidelines in 2011 that reduced HCV chronic care testing and consultations from twice per year to once per year.

To succeed with an unconstitutional medical treatment claim against prison administrators not involved in the treatment of an inmate's medical needs, a plaintiff must show that the official was (1) personally involved with a denial of treatment, (2) deliberately interfered

---

[5] Although this ruling rests on the merits of the case, the Court notes that even if there were material issues of fact, the defendants would likely be entitled to qualified immunity for actions taken in their official capacity. *See Pearson v. Callahan*, 555 U.S. 223, 231 (2009) ("The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." (internal quotation marks omitted)).

9

with a prison doctor's treatment, or (3) tacitly authorized or was deliberately indifferent to the medical provider's misconduct when even a lay person would understand that the medical provider is being deliberately indifferent. *Miltier v. Beorn*, 896 F.2d 848, 854 (4th Cir. 1990). Gordon alleges deliberate indifference, which requires a state actor to have been personally aware of facts indicating a substantial risk of serious harm, and the actor must have actually recognized the existence of such a risk. *Farmer v. Brennan*, 511 U.S. 825, 838 (1994); *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). "Deliberate indifference may be demonstrated by either actual intent or reckless disregard." *Miltier*, 896 F.2d at 851; *see Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004) ("[T]he evidence must show that the official in question subjectively recognized that his actions were 'inappropriate in light of that risk.'"). "A defendant acts recklessly by disregarding a substantial risk of danger that is either known to the defendant or which would be apparent to a reasonable person in the defendant's position." *Miltier*, 896 F.2d at 851-52. Supervisory prison officials are entitled to rely on the professional judgment of trained medical personnel. *Id.*

Even after reviewing the evidence and inferences in a light most favorable to him, Gordon fails to establish the defendants' deliberate indifference. Nothing in Schilling's responses to grievances nor Dr. Amonette's one-year suspension of the chronic care treatment guidelines constitutes their personal involvement with a denial of treatment for Plaintiff or deliberate interference with a prison doctor's treatment of him. The record establishes that, regardless of Gordon's attempts to receive free chronic care appointments for preventative treatment for HCV, Gordon had access to a medical doctor and other medical staff at his facilities. Medical staff's evaluations between December 2008 and September 2014 resulted in

10

diagnoses of "within normal limits" that, in their medical judgment, warranted continued monitoring.

While Gordon is dissatisfied that no doctor has ordered HCV treatment thus far, his dissatisfaction or disagreement about the course of treatment does not entitle him to relief via Section 1983. *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985); *Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975) (per curiam). There is nothing in the record suggesting the medical staff's decisions about treatment is contraindicated or that not enrolling Gordon in a treatment program due to parole timing has affected his condition or exposed him to a substantial risk of harm. Schilling repeatedly encouraged Gordon to submit a sick call request to consult with medical staff if he had a concern about his health, and notably, Gordon does not allege that he was ever denied access to acute medical care. Accordingly, defendants are entitled summary judgment on these claims.[6]

However, more information is needed to adjudicate the remaining claim about the reduction of chronic care visits per year beginning in 2011.[7] This claim, which ostensibly accrued in 2011, may be barred by the applicable two-year statute of limitations. *See, e.g.*, *Bay Area Laundry and Dry Cleaning Pension Trust Fund v. Ferbar Corp. of Cal.*, 522 U.S. 192, 201 (1997); *Owens v. Okure*, 488 U.S. 235, 249-50 (1989); Va. Code § 8.01-243(A). Although noted passingly in defendants' answer, the parties have not briefed the issue, and I will not resolve the

---

[6] *See* supra note 5.

[7] Dr. Amonette was not employed by the VDOC at that time. To the extent the prior VDOC Medical Director and Chief VDOC Physician caused the policy change from semi-annual to annual visits, Dr. Amonette could be the proper defendant in an official capacity, but damages would not be available against him. *See, e.g.*, *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989); *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977); *Gray v. Laws*, 51 F.3d 426, 430 (4th Cir. 1995).

11

question without their input per Federal Rule of Civil Procedure 56(f)(2). Accordingly, defendants shall file a motion for summary judgment addressing the statute of limitations.

### III.

For the reasons stated, I will grant the defendants' motion for summary judgment and deny Gordon's motion for summary judgment as to all claims except those regarding the policy change in 2011. I will direct defendants to file a motion for summary judgment within thirty days that addresses the time bar for the remaining claim.

**ENTER**: This 13th day of September, 2016.

*/s/ Norman K. Moon*
NORMAN K. MOON
UNITED STATES DISTRICT JUDGE

12