**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────────

No. 17-7298

───────────────

CARL D. GORDON,

　　　　　　Plaintiff – Appellant,

　　　　v.

DIRECTOR FRED SCHILLING, Health Services Director of Virginia
Department of Corrections; MARK AMONETTE, Chief Physician of the Virginia
Department of Corrections,

　　　　　　Defendants – Appellees.

───────────────

Appeal from the United States District Court for the Western District of Virginia, at
Roanoke.  Norman K. Moon, Senior District Judge.  (7:15-cv-00095-NKM-RSB)

───────────────

Argued:  April 2, 2019　　　　　　　　　　Decided:  September 4, 2019

───────────────

Before GREGORY, Chief Judge, and KING, Circuit Judge.[1]

───────────────

Vacated and remanded by published opinion.  Judge King wrote the opinion, in which
Chief Judge Gregory joined.

───────────────

**ARGUED:** C. Harker Rhodes IV, KIRKLAND & ELLIS LLP, Washington, D.C., for
Appellant.  Margaret Hoehl O'Shea, OFFICE OF THE ATTORNEY GENERAL OF
VIRGINIA, Richmond, Virginia, for Appellees.  **ON BRIEF:** Erin E. Murphy,

───────────────

[1] This opinion is filed by a quorum of the panel pursuant to 28 U.S.C. § 46(d).
Judge Thacker was selected as the third panelist but was unable to participate.

KIRKLAND & ELLIS LLP, Washington, D.C., for Appellant. Mark R. Herring, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellees.

———————

KING, Circuit Judge:

Plaintiff Carl D. Gordon, a Virginia inmate, appeals from a summary judgment award made by the district court in favor of the defendants, two officials within the Virginia Department of Corrections (the "VDOC"): Health Services Director Fred Schilling and Chief Physician Mark Amonette. In his pro se complaint filed pursuant to 42 U.S.C. § 1983, Gordon claims that the defendants contravened his Eighth Amendment rights by denying him treatment for his Hepatitis C virus ("HCV"). At the close of discovery, the district court granted summary judgment in favor of the defendants, ruling that they had no personal involvement in treatment decisions related to Gordon's HCV and that, in any event, Gordon's disease had been adequately monitored by VDOC physicians. *See Gordon v. Schilling*, No. 7:15-cv-00095 (W.D. Va. Sept. 13, 2016), ECF No. 30 (the "Opinion"). For the reasons that follow, we vacate and remand.

I.

A.

1.

This appeal primarily concerns VDOC treatment guidelines that categorically excluded an HCV-positive inmate from receiving HCV treatment because of his parole eligibility or predicted release date.[2] HCV is a viral disease that affects the liver. Early

---

[2] The constitutionality of similar HCV treatment policies — that is, policies categorically excluding certain inmates from receiving HCV treatment — has been challenged in federal courts across the country. *See Lovelace v. Clarke*, No. 2:19-cv- (Continued)

in the progression of HCV (the so-called "acute phase"), the disease can cause jaundice, nausea, and fatigue. *See Roe v. Elyea*, 631 F.3d 843, 848 (7th Cir. 2011). Some persons infected with HCV experience a resolution of symptoms during the acute phase. But for up to 85% of HCV-infected persons, the disease progresses into a chronic condition. Many of those afflicted with chronic HCV will experience liver damage, including scarring of the liver tissue, which is known as progressive fibrosis. *Id.* And about 20% of those with chronic HCV will develop cirrhosis of the liver, that is, long-term liver damage. Cirrhosis can lead to liver failure, and those with cirrhosis also face a significant risk of developing liver cancer. Liver failure and liver cancer "frequently develop in [HCV-]infected individuals up to twenty or thirty years after initial infection." *Id.*

HCV is transmitted through blood-to-blood contact and is frequently spread through the use of shared needles. Due in part to its means of transmission, HCV is relatively common among prison populations, affecting 16% to 41% of incarcerated individuals. *See* Scott A. Allen et al., *Hepatitis C Among Offenders*, 67 Fed. Probation 22, 24 (2003). That percentage is substantially higher than the rates of HCV observed among the general public. *Id.*

---

00075, slip op. at 11-12 (E.D. Va. Aug. 7, 2019), ECF No. 23 (collecting cases). Some of those lawsuits have resulted in injunctive relief requiring HCV treatment for inmates. *See Buffkin v. Hooks*, No. 1:18-cv-00502, slip op. at 31-32, 36 (M.D.N.C. Mar. 20, 2019), ECF No. 55; *Hoffer v. Jones*, 290 F. Supp. 3d 1292, 1294 (N.D. Fla. 2017).

2.

In 2004, given the prevalence of HCV among inmates within its custody, the VDOC issued the now-rescinded treatment guidelines at issue in these proceedings (the "2004 Guidelines," or the "Guidelines").  The 2004 Guidelines explained that HCV "represents a potentially serious problem within the correctional environment."  *See* J.A. 34.[3]  In addition, the Guidelines acknowledged that up to 85% of those infected with HCV develop a "chronic disease," that about 20% of those inflicted with chronic HCV will experience cirrhosis, that some of those with cirrhosis will also develop liver cancer, and that HCV can be fatal.  *Id.*

The 2004 Guidelines also set forth the criteria that VDOC physicians were constrained to apply in diagnosing HCV and deciding whether to treat an inmate for that disease.  In order for an inmate to be diagnosed with HCV under the Guidelines, he had to test positive for the HCV antibody and have two blood test results showing an elevated level of a certain liver enzyme (alanine transaminase) over a six-month period.  But an HCV diagnosis did not automatically qualify an inmate for treatment.  That is, the Guidelines contained "exclusion and inclusion criteria" for treatment eligibility and instructed physicians to "review carefully" that criteria "[p]rior to consideration [of an inmate] for [HCV] treatment."  *See* J.A. 35.

---

[3] Citations herein to "J.A. __" refer to the contents of the Joint Appendix filed by the parties in this appeal.

The 2004 Guidelines specified many reasons for excluding an HCV-positive inmate from treatment. Pertinent here, an HCV-positive inmate was categorically excluded from receiving HCV treatment if he was either "parole eligible" or if he had less "than 24 months remaining to serve after [undergoing a] liver biopsy." *See* J.A. 36. Consequently, the Guidelines precluded a physician within the VDOC system from providing treatment for HCV to a parole-eligible inmate or an inmate who would be released within two years.

An HCV-positive inmate who satisfied the treatment criteria (e.g., by not being parole eligible and not having less than two years remaining on his sentence) would receive a "baseline workup" — consisting of an array of medical tests — followed by a liver biopsy to determine the levels of fibrosis and inflammation in his liver. *See* J.A. 37. Contingent on the biopsy results, an inmate's HCV would then be treated using two medications: pegylated interferon and ribavirin. According to the 2004 Guidelines, that course of medications would last from six to twelve months, dependent on the particular genotype of the disease.[4] Pegylated interferon and ribavirin have a success rate of between 40% and 80% in treating HCV. *See* Allen et al., *supra*, at 22. But stopping the medications prior to completing the entire course of therapy can cause resistance thereto and have detrimental health effects for the patient.

---

[4] The 2004 Guidelines also required that an HCV-positive inmate undergo six months of post-medication testing to assess the status of the disease.

In contrast, the 2004 Guidelines allowed a parole-eligible inmate to be enrolled in a "chronic care clinic." *See* J.A. 37. An inmate who qualified for that clinic was entitled to receive a physical examination and liver function tests twice each year. Unlike an inmate who was not parole eligible and otherwise satisfied the treatment criteria, an inmate in the chronic care clinic would not receive a baseline workup, a liver biopsy, and treatment.

3.

Plaintiff Gordon has been incarcerated in the VDOC system since 1980. Although his mandatory parole date is October 2028, Gordon is eligible for discretionary parole and can be reviewed for such parole annually. Gordon has been eligible for discretionary parole since at least 2002, but he has consistently declined hearings before the Virginia Parole Board.

In March 2008, while incarcerated at the Red Onion State Prison, Gordon was diagnosed with HCV. According to Gordon, despite his HCV diagnosis, he was excluded from receiving treatment under the 2004 Guidelines because he was eligible for discretionary parole. Pursuant to the Guidelines, Gordon was placed in the chronic care clinic and received biannual liver function testing to monitor (rather than treat) his disease. Gordon received those biannual visits and tests from the time of his diagnosis in 2008 through the fall of 2011. One of the tests — performed in October 2011 — reflected elevated levels of liver enzymes that could indicate liver damage.

Beginning in 2011 and continuing into 2015, Gordon repeatedly brought his HCV diagnosis and the lack of any HCV treatment to the attention of VDOC officials,

7

including defendant Schilling, by way of administrative grievances.  As the VDOC's Health Services Director, Schilling was responsible for ensuring "compliance with the medical operating procedures at the institutional level."  *See* J.A. 105.[5]  In addition, Schilling was obliged to review "each policy . . . in the [VDOC] health care delivery system at least annually" and to revise any such policy "if necessary."  *See* VDOC Operating Procedure 701.1 § VII(B) (Mar. 2012), *available at* https://bit.ly/2M61zNt (last visited Aug. 12, 2019).[6]  Schilling was also responsible for reviewing and deciding grievance appeals related to inmate medical issues.

In early 2011, Gordon filed two grievances related to his HCV.  In those grievances, Gordon not only made prison officials aware of his HCV diagnosis but also of the "deadly" nature of the disease and his need for treatment to prevent further damage to his liver.  *See* J.A. 115.  Both of those grievances were denied, and Schilling reviewed Gordon's appeals of the denials.  In rejecting the appeals, Schilling acknowledged Gordon's "Hepatitis diagnosis," *id.* at 114, and stated that the prison medical professionals were "qualified to provide [him] with chronic care treatment for [his] disease," *id.* at 118.

---

[5] Schilling no longer holds the position of Health Services Director.  *See* Reply Br. of Appellant 17.

[6] Although VDOC Operating Procedure 701.1 is not in the record in these proceedings, we are entitled to take judicial notice of it.  *See Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015) (explaining that court can take judicial notice of public record).

Around the same time that Gordon filed his grievances, he learned that the VDOC would reduce the number of chronic care clinic visits and liver function tests for HCV-positive inmates from two per year to one per year. Gordon filed another grievance, challenging the reduction and explaining that the change contravened the recommendations of medical experts — such as those at the Centers for Disease Control and Prevention — that HCV patients have several medical check-ups each year. Multiple visits, as explained in Gordon's grievance, allowed necessary monitoring of the disease progression. As with the prior grievances, a prison official denied the grievance challenging the reduction in visits, and Schilling upheld the denial on appeal. Schilling again acknowledged that Gordon was diagnosed with HCV, that his liver enzymes should be regularly checked, and that Gordon requested biannual chronic care visits. Schilling responded, however, that VDOC medical personnel had "the autonomy to monitor [his] chronic medical condition." *See* J.A. 121. Schilling also advised Gordon to "follow the recommendations of the medical staff regarding [his] treatment plan," *id.*, but Schilling failed to mention that provisions of the 2004 Guidelines prevented VDOC medical staff from treating Gordon's HCV.

In May 2012, Gordon was transferred to Wallens Ridge State Prison. Despite remaining on the list of HCV patients enrolled in the chronic care clinic, Gordon did not receive any chronic care visit in 2012. Instead, a VDOC physician merely reviewed his chart in September 2012 and ordered lab work. About seven months later, in April 2013, Gordon again complained about his lack of chronic care visits. A prison official denied Gordon's grievance, and Schilling sustained the denial. In so doing, Schilling recognized

9

that Gordon had been diagnosed with a "Hepatitis infection" and that Gordon was in the chronic care clinic for management of that disease. *See* J.A. 29. Schilling concluded no policy or procedure had been violated, despite that Gordon had gone at least eighteen months by that point without a chronic care visit.

In June 2013, Gordon was still troubled by the denial of treatment for his HCV. Accordingly, he filed a grievance to obtain a copy of the "written guidelines and criteria for determining when treatment for HCV should begin." *See* J.A. 122. A prison official denied that request, and Schilling sustained the denial, explaining that prison medical personnel were responsible for Gordon's treatment and that Gordon could not receive a copy of VDOC's "[H]epatitis guidelines" because they were "restricted operating procedures." *Id.* at 126. Consistent with Schilling's previous correspondence to Gordon, he did not explain that the 2004 Guidelines excluded parole-eligible HCV-positive inmates from receiving additional diagnostic testing and treatment.

A few months later, in October 2013, Gordon resumed his efforts to obtain a chronic care check-up by filing another grievance. That grievance was denied by the warden at Wallens Ridge, who explained that Gordon's liver enzyme tests were "normal" in September 2013. *See* J.A. 128. Gordon appealed the denial in December 2013, and asserted in his appeal that "people often have normal [liver enzyme] levels while suffering severe liver damage." *Id.* at 133. He also emphasized that he went without a chronic care visit for the entirety of 2013.

In January 2014, Schilling approved the denial of Gordon's October 2013 grievance. For the first time, Schilling explained that Gordon was not entitled to receive

chronic care check-ups because, according to Schilling, Gordon did "not have a chronic care diagnosis that [VDOC] recognize[d] at th[e] time." *See* J.A. 129. According to Schilling, HCV did not qualify for the "chronic care clinic." *Id.* Schilling did not offer any explanation, however, as to why HCV was no longer "a chronic care diagnosis."

4.

In February 2014, defendant Amonette — who assumed the VDOC's Chief Physician position in March 2013 — announced the suspension of the 2004 Guidelines. According to Amonette, the suspension was warranted because, in January 2014, a national medical organization "recommend[ed] against using the treatment VDOC had been using since 2000" and "VDOC was not ready to start using new drugs" for treating HCV, that is, drugs other than pegylated interferon and ribavirin. *See* J.A. 103. By suspending the Guidelines, Amonette ceased all HCV medical care pending the adoption of new treatment guidelines and the finalization of a deal with the Virginia Commonwealth University Medical Center's hepatology group "to provide care for VDOC offenders with chronic Hepatitis C." *Id.* Amonette recognized, however, that interrupting pegylated interferon and ribavirin treatment could have negative health consequences for inmates and cause inmates to develop resistance to those medications.

In December 2014, ten months after Amonette suspended the 2004 Guidelines, Gordon obtained a copy of the Guidelines through discovery in another lawsuit. After reviewing the Guidelines, Gordon filed a grievance to challenge the categorical denial of HCV treatment due to his parole eligibility. Gordon complained that he never received treatment as a result of his parole eligibility despite that he had declined all discretionary

parole hearings since 2002. His grievance was denied at the initial level, and Schilling affirmed the denial. Although all HCV treatment had been suspended by Amonette, Schilling instructed Gordon that he could submit a sick call request to obtain a "treatment plan" for his HCV. *See* J.A. 138.[7]

Amonette's suspension of HCV treatment lasted for one year. In February 2015, HCV treatment within the VDOC resumed after new treatment guidelines were adopted (the "2015 Guidelines"). Under the 2015 Guidelines, an HCV-positive inmate was no longer excluded from treatment if he was parole eligible or if he had less than twenty-four months remaining on his sentence. According to Amonette, the 2004 Guidelines contained such an exclusion because "it is not ideal to have offenders leaving prison in the middle of [HCV] treatment," and a patient could develop resistance to the "old medications" (i.e., pegylated interferon and ribavirin) or suffer harm if the full course of treatment were not completed. *See* J.A. 103.

Several months after the adoption of the 2015 Guidelines, in June 2015, the VDOC finalized an arrangement with the VCU Medical Center, and VCU physicians began treating VDOC inmates that same month. The following month, Gordon underwent medical testing as a result of the 2015 Guidelines created by Amonette. The testing revealed that Gordon had developed stage 3 fibrosis, a "high" level of liver

---

[7] Similar to 2012 and 2013, Gordon did not receive a chronic care visit in all of 2014.

damage that represents the final stage before the onset of cirrhosis of the liver. *See* J.A. 97.[8]

## B.

In March 2015, several months before Gordon would learn that he had developed stage 3 fibrosis, he initiated this lawsuit against the defendants by filing his pro se § 1983 complaint in the Western District of Virginia.[9] In relevant part, Gordon alleged that the defendants had been deliberately indifferent to his serious medical needs and thereby contravened his Eighth Amendment rights. Specifically, Gordon alleged that the defendants knew that he had HCV but prevented VDOC physicians from treating him for that disease.[10]

For reasons explained in its Opinion of September 13, 2016, the district court granted summary judgment in favor of the defendants on the Eighth Amendment deliberate indifference claims. The court ruled that the defendants were not personally involved in any decisions related to the treatment of Gordon's HCV and did not interfere

---

[8] According to the defendants, Gordon "was cured of his HCV infection by 2016." *See* Br. of Appellees 9 n.40. Nothing in the record supports that assertion.

[9] Gordon's pro se complaint alleged claims against the defendants in their personal and official capacities. On appeal, Gordon has clarified that he solely pursues his personal-capacity claims.

[10] In addition to the Eighth Amendment deliberate indifference claims relevant to this appeal, Gordon alleged that the defendants contravened the Eighth Amendment by reducing the number of chronic care visits in 2011, and that they also violated the Due Process and Equal Protection Clauses. The district court awarded summary judgment to the defendants on those additional claims, and Gordon has not contested those rulings on appeal.

"with a prison doctor's treatment of him." *See* Opinion 10. The court also emphasized that Gordon had access to a physician while incarcerated and that medical evaluations "between December 2008 and September 2014" were "within normal limits," which "warranted continued monitoring" of his HCV. *Id.* at 10-11. In addition, the court concluded that a summary judgment award to the defendants was proper because

> nothing in the record suggest[s] the medical staff's decisions about treatment [were] contraindicated or that not enrolling Gordon in a treatment program due to parole timing has affected his condition or exposed him to a substantial risk of harm. Schilling repeatedly encouraged Gordon to submit a sick call request to consult with medical staff if he had a concern about his health, and notably, Gordon does not allege that he was ever denied access to acute medical care.

*Id.* at 11.

Gordon timely filed a notice of appeal, and we assigned counsel to represent him in this Court. We possess jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

We review de novo a district court's award of summary judgment pursuant to Federal Rule of Civil Procedure 56. *See United States v. Ancient Coin Collectors Guild*, 899 F.3d 295, 312 (4th Cir. 2018). In conducting such a review, we are obliged to view "the facts and inferences reasonably drawn therefrom in the light most favorable to the nonmoving party." *Id.* (internal quotation marks omitted). Summary judgment is properly awarded only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Butler v. Drive Auto. Indus. of Am., Inc.*, 793 F.3d 404, 408 (4th Cir. 2015) (internal quotation

marks omitted).  That is, the relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

III.

On appeal, Gordon challenges the district court's summary judgment award to the defendants on his Eighth Amendment deliberate indifference claims.  It is beyond debate that a "prison official's deliberate indifference to an inmate's serious medical needs constitutes cruel and unusual punishment under the Eighth Amendment." *See Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).[11]  In order to succeed on a deliberate indifference claim, the plaintiff is required to prove an objective component and a subjective component.  *See id.*  That is, the plaintiff must demonstrate that the defendant prison official acted with "deliberate indifference" (the subjective component) to the plaintiff's "serious medical needs" (the objective component).  *See Estelle*, 429 U.S. at 104.

The objective component of a deliberate indifference claim is satisfied by a serious medical condition.  *See Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016).  And a medical condition is serious when it has "been diagnosed by a physician as mandating

---

[11] The Eighth Amendment's proscription of cruel and unusual punishments is applicable to the States through the Fourteenth Amendment. *See Anderson v. Kingsley*, 877 F.3d 539, 543 (4th Cir. 2017).

15

treatment or is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *See id.* (alteration and internal quotation marks omitted). The defendants do not dispute that Gordon's HCV qualifies as a serious medical condition and thus satisfies the objective component of his deliberate indifference claims. *See* Br. of Appellees 20 ("Defendants did not argue to the district court that HCV is not an objectively serious medical need . . . and they do not make that argument on appeal."); *see also Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (concluding that prisoner sufficiently pleaded Eighth Amendment deliberate indifference claim based on denial of HCV treatment).

The defendants contest, however, that Gordon has put forth sufficient evidence on the subjective component of his Eighth Amendment claims. The subjective component is satisfied by proof of a defendant's deliberate indifference. *See Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). The Supreme Court has explained that "deliberate indifference entails something more than mere negligence," but the standard "is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *See Farmer v. Brennan*, 511 U.S. 825, 835 (1994). In the context of a claim related to the denial of medical treatment, a defendant "acts with deliberate indifference if he had actual knowledge of the [plaintiff's] serious medical needs and the related risks, but nevertheless disregarded them." *See DePaola v. Clarke*, 884 F.3d 481, 486 (4th Cir. 2018). A defendant's subjective knowledge can be proven "through direct evidence of [his] actual knowledge or circumstantial evidence tending to establish such knowledge, including evidence that [he] knew of a substantial risk from

16

the very fact that the risk was obvious." *See Scinto*, 841 F.3d at 226 (internal quotation marks omitted).

A.

Having spelled out the framework for deliberate indifference claims related to medical treatment, we begin our assessment of Gordon's appeal with his claim against Schilling.  As previously mentioned, the parties disagree as to whether a genuine dispute of material fact exists regarding the subjective prong of the claim.  According to Gordon, the evidence shows that Schilling knew that Gordon had HCV and was not being treated for it.  Gordon asserts that "[a] reasonable jury could easily infer, given Schilling's position as the VDOC Health Services Director and his familiarity with prison health issues, that Schilling was likewise aware of the risk that Gordon would suffer serious liver damage as a result." *See* Br. of Appellant 23.  And Gordon contends that a factfinder could find that Schilling was personally involved in the denial of treatment for Gordon's HCV because Schilling was responsible for reviewing, revising, and enforcing the 2004 Guidelines that excluded Gordon from treatment.

We agree with Gordon that genuine disputes of material fact preclude an award of summary judgment to Schilling on the deliberate indifference claim.  Gordon has produced evidence demonstrating Schilling's knowledge of his HCV and his lack of treatment for that disease.  *See DePaola*, 884 F.3d at 486 (explaining that defendant must be aware of plaintiff's serious medical needs).  Indeed, Gordon's grievance appeals — reviewed and denied by Schilling — detailed those facts.  And Schilling acknowledged in denying the grievances that Gordon had HCV and was not being treated for it.

17

Additionally, there is evidence that Schilling was aware that a lack of treatment for someone diagnosed with HCV, like Gordon, could create a substantial risk of harm to that person.  *See Iko*, 535 F.3d at 241 (emphasizing that the defendant must have "*actual knowledge of the risk of harm*" to the plaintiff).  The 2004 Guidelines themselves, which Schilling was tasked with reviewing and revising annually, detailed the prevalence of HCV among the prison population and the risks associated with the disease, including cirrhosis, liver cancer, and death.  Moreover, Gordon advised Schilling of the health risks presented by untreated HCV in his grievance appeals.  *See, e.g.*, J.A. 125 (describing HCV as "a deadly disease"); *id.* at 133 (emphasizing that HCV can cause severe liver damage).

Importantly, a factfinder could also conclude that Schilling disregarded the substantial risk of harm presented to Gordon by his untreated HCV.  *See Iko*, 535 F.3d at 241 (explaining that defendant must have disregarded risk posed by plaintiff's serious medical needs).  Rather than seriously considering Gordon's requests for HCV treatment and endeavoring to discover why he was not receiving it, Schilling — as the Health Services Director — repeatedly passed the buck.  Indeed, he instructed Gordon to put in sick call requests and advised him that a VDOC physician would "determine the course of [his] [H]epatitis treatment."  *See* J.A. 126.  Although a nonmedical prison official can generally defer to the decisions of prison medical personnel at the institutional level, a sick call request in these circumstances would do nothing more than get Gordon examined by a VDOC physician who — pursuant to the 2004 Guidelines enforced by Schilling — would be precluded from ordering HCV treatment because of Gordon's

18

parole eligibility. *See Iko*, 535 F.3d at 242 (distinguishing claim seeking to hold nonmedical official liable for actions of medical professional from claim based on nonmedical official's own decisions related to medical care); *see also Langford v. Norris*, 614 F.3d 445, 462 (8th Cir. 2010) (rejecting argument that nonmedical prison official could not be liable because he was not engaged in day-to-day medical care).[12] And from February 2014 to February 2015, Schilling knew that a VDOC physician could ostensibly do nothing for Gordon's HCV as a result of the suspension of the 2004 Guidelines.

Insofar as the district court ruled that Schilling was not personally involved in any decisions related to the treatment of Gordon's HCV, we are satisfied that there is evidence to the contrary. *See Williamson v. Stirling*, 912 F.3d 154, 171 (4th Cir. 2018) ("To establish personal liability under § 1983 . . . the plaintiff must affirmatively show that the official charged acted personally in the deprivation of the plaintiff's rights." (alteration and internal quotation marks omitted)). As explained previously, the record reflects that Schilling reviewed and denied many grievance appeals submitted by Gordon

---

[12] The defendants assert that, prior to 2015, Schilling did not know that Gordon was parole eligible. Schilling knew, however, that Gordon had been referred to the chronic care clinic for some reason specified in the 2004 Guidelines (e.g., parole eligibility) and thus was not receiving HCV treatment. Schilling — who was responsible for reviewing inmate medical issues — should not benefit from performing no investigation to discern why Gordon had not received HCV treatment. To the extent the defendants contend that Gordon might have been ineligible to receive HCV treatment under the 2004 Guidelines for reasons other than parole eligibility, nothing in the record suggests that Schilling ever documented any such reasons or advised Gordon of them. Because we are obliged to review the evidence in the light most favorable to Gordon, we must accept Gordon's record-supported assertion that he was denied HCV treatment because of his parole eligibility. *See United States v. Ancient Coin Collectors Guild*, 899 F.3d 295, 312 (4th Cir. 2018).

that requested HCV treatment. *See DePaola*, 884 F.3d at 488 (ruling that VDOC prisoner sufficiently alleged Eighth Amendment deliberate indifference claim against Schilling based on denial of mental health treatment).

Notably, by the very nature of Schilling's position, he was personally involved in reviewing and enforcing the 2004 Guidelines that prevented Gordon from receiving HCV treatment. *See Roe v. Elyea*, 631 F.3d 843, 859, 867 (7th Cir. 2011) (affirming jury verdict against Illinois Department of Corrections medical director for implementing policy that required inmate to have at least two years remaining on sentence to receive HCV treatment). And Schilling's consistent failure to revise the Guidelines to remove the parole-eligibility exclusion constitutes personal involvement in the denial of HCV treatment for Gordon. *See McKenna v. Wright*, 386 F.3d 432, 437 (2d Cir. 2004) (concluding that prison officials' personal involvement was sufficiently alleged where they were responsible for continuing and enforcing policies that denied HCV treatment).[13] Similarly, a factfinder could reasonably infer that Schilling personally assented to the suspension of HCV treatment for all inmates from February 2014 to

---

[13] The defendants contend that Gordon's pro se complaint did not allege deliberate indifference predicated on Schilling's failure to revise the 2004 Guidelines. We are satisfied, however, that Gordon's allegations concerning Schilling's responsibilities in implementing and enforcing the Guidelines — when liberally construed — are sufficient to encompass such a claim. *See DePaola*, 884 F.3d at 486 (emphasizing that "we construe pro se pleadings liberally, particularly if the pro se plaintiff raises civil rights issues" (citations omitted)). The defendants also take a "passing shot" at a statute of limitations argument in relation to the failure to revise claim, but it does not warrant our review. *See Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017) (explaining that party waives argument by taking passing shot at it).

February 2015.  We are thus satisfied that the foregoing evidence is sufficient to establish a genuine issue of material fact as to Schilling's personal involvement in the denial of treatment for Gordon's HCV.

We are also unpersuaded by the district court's reliance on Gordon's "normal" medical evaluations and his purported failure to allege that "he was ever denied access to acute medical care."  *See* Opinion 11.  With respect to the medical evaluations, Gordon has produced evidence (1) that medical test results concerning his liver were not always "normal," and (2) that, even when certain liver enzyme test results were within normal limits, he could be suffering from ongoing liver damage.  Regarding the Opinion's acute care point, it is inconsistent with the Eighth Amendment for a prison official to withhold treatment from an inmate who suffers from a serious, chronic disease until the inmate's condition significantly deteriorates.  *See Jehovah v. Clarke*, 798 F.3d 169, 181-82 (4th Cir. 2015) (emphasizing that refusal to treat serious medical need can constitute deliberate indifference); *Smith v. Smith*, 589 F.3d 736, 739 (4th Cir. 2009) (explaining that delay in treatment can contravene Eighth Amendment); *see also Fields v. Smith*, 653 F.3d 550, 556 (7th Cir. 2011) ("Refusing to provide effective treatment for a serious medical condition serves no valid penological purpose and amounts to torture.").[14]  For

---

[14] The defendants characterize Gordon's deliberate indifference claim against Schilling as presenting a disagreement between Gordon and "medical personnel regarding diagnosis and course of treatment [that] does not implicate the Eighth Amendment."  *See* Br. of Appellees 19 (citing *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985)).  They are mistaken in that characterization.  Gordon does not merely disagree with the course of treatment for his HCV; rather, he complains that he received *no treatment at all*.  *See Darrah v. Krisher*, 865 F.3d 361, 370 (6th Cir. 2017) (Continued)

21

those reasons, we are satisfied that genuine disputes of material fact exist as to Gordon's deliberate indifference claim against Schilling.[15]

## B.

Turning to Gordon's deliberate indifference claim against Amonette, the parties again focus on the subjective component of the claim. Gordon argues that Amonette "knew of the dangers of leaving HCV untreated" but failed to rescind the 2004 Guidelines for eleven months after he assumed the role of Chief Physician. *See* Br. of Appellant 23. Gordon also faults Amonette for denying medical care to all HCV-positive inmates for a year while he developed new treatment guidelines. Although Amonette has asserted that medical reasons supported his decisions, Gordon contends that there are "serious factual questions as to whether those medical reasons can actually justify the blanket policies at issue." *Id.* at 24.

We agree with Gordon that genuine disputes of material fact exist as to his claim against Amonette. To start, a factfinder could determine that Amonette knew that HCV is a serious disease that affects a large percentage of those incarcerated in VDOC facilities. *See DePaola*, 884 F.3d at 486 (explaining that defendant must be aware of serious medical need). Amonette is a medical doctor, and as Chief Physician, he ensured

---

("[M]edical care which is so cursory as to amount to no treatment at all may amount to deliberate indifference." (internal quotation marks omitted)).

[15] Although we ordered the parties to brief whether Schilling possessed the authority to order an exception to the 2004 Guidelines and how any such authority might affect his potential liability, we leave those issues for the district court to address in the first instance on remand, if necessary.

compliance with — and eventually revised — the 2004 Guidelines. The Guidelines explicitly recognized that HCV "represents a potentially serious problem within the correctional environment," and that "incarcerated individuals have a considerably higher prevalence of [HCV] infection than the general population." *See* J.A. 34.

Gordon has also presented evidence that Amonette knew that a lack of treatment for someone diagnosed with HCV, like Gordon, creates a substantial risk of harm to that person. *See Iko*, 535 F.3d at 241 (emphasizing that the defendant must have "*actual knowledge of the risk of harm*"). Again, Amonette is the Chief Physician for a state prison system, and by virtue of that role, it is entirely reasonable to presume that he is familiar with the risks presented by untreated HCV. In addition, the 2004 Guidelines explicitly describe the serious health consequences of untreated HCV.

Significantly, a reasonable jury could find that Amonette disregarded the substantial risk of harm presented to inmates with untreated HCV in two ways: (1) by failing to rescind the 2004 Guidelines for eleven months after assuming the role of Chief Physician, and (2) by discontinuing all HCV medical care for a year through the suspension of the 2004 Guidelines, without instituting a replacement policy. *See Iko*, 535 F.3d at 241 (explaining that defendant must have disregarded risk posed by inmate's serious medical needs).[16] As to the former, Amonette undoubtedly had the authority to

---

[16] The defendants assert that Gordon's pro se complaint did not allege deliberate indifference predicated on Amonette discontinuing all HCV medical care for a year through the suspension of the 2004 Guidelines. We agree with the district court, however, that Gordon's allegations concerning the denial of HCV treatment, when liberally construed, cover such a claim. *See* Opinion 9; *DePaola*, 884 F.3d at 486.

rescind the 2004 Guidelines, but he allowed them to remain in effect for almost a year, effectively denying HCV treatment to all parole-eligible inmates, including Gordon. Although Amonette has contended that medical reasons supported the Guidelines' exclusion of parole-eligible inmates from HCV treatment, we are satisfied that there are genuine disputes of fact as to the soundness of those reasons. Indeed, the Guidelines required no assessment of an inmate's actual chances of being paroled before applying the categorical treatment denial. *See Roe*, 631 F.3d at 860 (explaining that, when using treatment guidelines in the prison context, a prison official must still make an individualized "determination that application of the [guidelines] result[s] in adequate medical care" for the inmate); *Salahuddin v. Goord*, 467 F.3d 263, 281 (2d Cir. 2006) (concluding that it is unreasonable for prison official to postpone HCV treatment because of parole possibility without assessing "inmate's actual chances of parole"). In addition, Amonette's asserted medical justification for denying HCV treatment to an inmate who might be released within two years is questionable under the 2004 Guidelines themselves. That is, the Guidelines explain that treatment can be completed for certain HCV genotypes within six to twelve months. Accordingly, there are genuine disputes of material fact as to whether Amonette allowing the Guidelines to remain in effect for almost a year exhibited a disregard for the substantial risk of harm presented to inmates by untreated HCV.

There is also evidence from which a factfinder could conclude that Amonette's suspension of the 2004 Guidelines for a year — without instituting a substitute policy — constitutes deliberate indifference. That is, a factfinder could determine that the

categorical postponement of medical care for HCV-positive inmates from February 2014 to February 2015 evinced a disregard for the wellbeing of those inmates. Although Amonette has again offered medical justifications for that decision, there are genuine disputes of material fact regarding the sufficiency of those justifications. For example, Amonette has explained that he suspended the 2004 Guidelines because, in January 2014, a national medical organization "recommend[ed] against using the treatment VDOC had been using since 2000." *See* J.A. 103. Amonette has also acknowledged, however, the substantial risk of harm from suspending treatment for all inmates with HCV. Indeed, he has recognized that interrupting pegylated interferon and ribavirin treatment can have negative health consequences for patients. Despite that knowledge, Amonette suspended all treatment anyway.

Moreover, as to Gordon specifically, there is even less medical support for the decision to cancel his chronic care visits by the suspension of the 2004 Guidelines. In fact, Amonette has not offered any medical justification for the termination of chronic care visits, which suggests that Amonette halted the Guidelines in their entirety for administrative reasons. In other words, a reasonable factfinder could determine that Amonette's decision to suspend the Guidelines without a ready substitute was predicated on administrative convenience rather than medical judgment. *See Roe*, 631 F.3d at 860 (concluding that jury could reasonably find that medical director acted with deliberate indifference when, in formulating HCV treatment policy, he "was motivated by administrative convenience rather than patient welfare"); *see also Parkell v. Danberg*, 833 F.3d 313, 337 (3d Cir. 2016) (explaining that delaying treatment for "non-medical

reason" can constitute deliberate indifference). Consequently, genuine disputes of material fact exist as to whether Amonette's suspension of the 2004 Guidelines without instituting another policy for a year evinced a disregard for the substantial risk of harm presented to inmates by their HCV.

Insofar as Amonette might not have known that his aforementioned actions would harm Gordon in particular, we are entirely unconvinced that he is entitled to a summary judgment award on that basis. Put simply, Amonette may not escape liability by claiming that he did not know the identities of the inmates who would suffer under his policies. *See Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015) ("[P]rison officials may not simply bury their heads in the sand and thereby skirt liability."); *Roe*, 631 F.3d at 861-67 (affirming jury verdict against medical director for his role in creating policy that categorically denied HCV treatment based on inmates' release dates); *Slakan v. Porter*, 737 F.2d 368, 374-76 (4th Cir. 1984) (upholding jury verdict against prison official who failed to end unconstitutional policy without assessing whether official knew that plaintiff would be injured by implementation of that policy). To rule otherwise would encourage prison officials to turn a blind eye to the real-world consequences of their policymaking and permit them to escape liability for constitutional harms caused by their decisions.[17]

---

[17] To the extent defendants assert that Amonette can escape liability because he relied on the professional judgment of VDOC medical personnel at the institutional level, we reject that position. In that regard, we emphasize that the HCV treatment policies enforced and implemented by Amonette apparently constrained the judgment of such professionals.

We are also compelled to address and dispatch the defendants' contention that Amonette is not subject to a personal-capacity claim for his policymaking decisions. That is, the defendants assert that Amonette can be held liable only in his official capacity for creating and enforcing the challenged policies. We disagree. The defendants are correct that Gordon pursues a deliberate indifference claim against Amonette in his personal capacity in that Gordon "seek[s] to impose personal liability" on Amonette for actions that he took "under color of state law." *See Kentucky v. Graham*, 473 U.S. 159, 165 (1985); *see also Adams v. Ferguson*, 884 F.3d 219, 225 (4th Cir. 2018) (discussing factors to consider in distinguishing between personal versus official capacity). The defendants are incorrect, however, in their assertion that a person injured by an unconstitutional policy is limited to an official-capacity claim against the official who created or enforced that policy. *See Hafer v. Melo*, 502 U.S. 21, 26 (1991) (emphasizing that a court should focus on "the capacity in which the state officer is sued, not the capacity in which the officer inflicts the alleged injury"); *Jackson v. Nixon*, 747 F.3d 537, 543 (8th Cir. 2014) (recognizing that official can be personally liable for creating or applying unconstitutional policy); *Roe*, 631 F.3d at 859, 867 (affirming jury verdict against medical director sued in personal capacity for his implementation of HCV treatment policy); *Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010) (explaining that official can be personally liable for creating or implementing unconstitutional policy); *Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir. 1997) (same). For the aforementioned reasons, we are satisfied that genuine issues of material fact exist as to Gordon's deliberate indifference claim against Amonette.

C.

Finally, we turn to the defendants' alternate argument for affirming the district court's summary judgment award. Specifically, the defendants contend that they are entitled to qualified immunity on Gordon's Eighth Amendment deliberate indifference claims and that the district court has already ruled in that regard. The defendants, however, misread the Opinion. The court did not determine whether the defendants are entitled to qualified immunity on the deliberate indifference claims. Here, we conclude, as previously explained, that factual disputes exist as to whether the defendants contravened Gordon's Eighth Amendment rights. *See Willingham v. Crooke*, 412 F.3d 553, 560 (4th Cir. 2005) ("[T]o the extent that a dispute of material fact precludes a conclusive ruling on qualified immunity at the summary judgment stage, the district court should submit factual questions to the jury and reserve for itself the legal question of whether the defendant is entitled to qualified immunity on the facts found by the jury.").

IV.

Pursuant to the foregoing, we vacate the district court's summary judgment award to the defendants on the Eighth Amendment deliberate indifference claims and remand for such other and further proceedings that are consistent herewith.

*VACATED AND REMANDED*